UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DEVOS, LTD., also doing business as
GUARANTEED RETURNS,

                        Plaintiff,

      -against-

JACOB RECORD, GREG OLSON, MICHAEL
GRANADOS, SHAWN OUCHI, OUTDATE RX
LLC and JOHN DOES 1-10,

                    Defendants.
------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
15-cv-6916(ADS)(AYS)

## APPEARANCES:

**Certilman Balin Adler & Hyman, LLP**
*Attorneys for the Plaintiff*
90 Merrick Avenue, 9th Floor
East Meadow, NY 11554
      By:   Douglas E. Rowe, Esq.
              Anthony W. Cummings, Esq., Of Counsel

**Michael M. McClellan, Esq.**
*Attorney for the Defendants*
320 Carleton Avenue, Suite 6800
Central Islip, NY 11722

**SPATT, District Judge:**

Presently before the Court is a motion by the Plaintiff Devos, Ltd., also doing

business as Guaranteed Returns ("Devos" or the "Plaintiff"), brought by Order to

Show Cause, seeking a preliminary injunction preventing the Defendants Jacob

Record ("Record"), Greg Olson ("Olson"), Michael Granados ("Granados"), Shawn

Ouchi ("Ouchi"), and Outdate Rx LLC ("ORX"), from unfairly competing with the

Plaintiff, and otherwise engaging in conduct which violates certain restrictive covenants.

## I.     Background

The following facts are drawn from the supporting declarations and other evidence submitted in connection with the instant motion.

### A.     The Business of Devos

Devos, a company headquartered in Holbrook, New York, is engaged in an industry known as "reverse pharmaceutical distribution."  From the parties' submissions, the Court is advised that reverse distributors facilitate and manage the return of excess, expired, recalled, or damaged pharmaceutical drugs, usually for a monetary refund or similar credit, on behalf of healthcare providers, such as hospital pharmacies, and long-term care providers.  For this service, reverse distributors will often charge its clients, namely, the healthcare providers, a fee equal to a percentage of the refund it obtains.

In a supporting affidavit, the Executive Vice President of Devos, one Darren Volkes ("Volkes"), stated that Devos has approximately 275 employees, subcontractors, and representatives, who operate on behalf of the company across the United States and abroad.  See Dec. 2, 2015 Declaration of Darren Volkes ("Volkes Decl.") ¶ 8.  Volkes stated that the reverse pharmaceutical distribution industry is "highly competitive" and that, although other companies provide services that bear similarities to Devos, the following "distinctive elements" set Devos apart from its competition:  "[its] customers; the manner in which [it]

establish[es] and deepen[s] [its] customer relationships; [its] prices; and [its] profit margins." Id. ¶ 9. Volkes further stated that Devos considers its customer relationships to be its most valuable asset. See id. ¶ 10.

## B. The Defendants' Subcontractor Agreements

The issues in this case arise principally from certain subcontractor agreements entered into between Devos and the individual Defendants.

In particular, identical subcontractor agreements were executed by the Defendants Ouchi, Granados, Record, and Olson on October 28, 2009; November 2, 2009; November 30, 2009; and February 25, 2010, respectively. These agreements are in the record collectively as Exhibit "A" to the Volkes Declaration.

Of relevance here, the individual Defendants also executed identical restrictive covenants (the "Restrictive Covenant(s)"), which provide, in pertinent part, as follows:

> During the term hereof and for a period of Thirty six (36) months following termination for any reason whatsoever of Representative's engagement with [Devos] whether such termination is voluntary or involuntary, with cause or without cause, with or without notice, as the case may be, Representative shall not in any manner whatsoever, directly and/or indirectly, either as an employee, owner, partner, joint venture, agent, stockholder, director, officer, consultant, independent contractor or in any other capacity whatsoever, engage in [Devos]'s Business, within the continental United States, including, without limitation, any and all states or countries in which Representative has preformed [sic] any duties for [Devos], whether as the person in charge or not, or as a representative that has any kind of contact with a customer, including, but not limited to telephone, facsimile transmission, etc.

(emphasis supplied).

For purposes of this opinion, the Court will refer to this provision of the Restrictive Covenant as the "Non-Competition Provision."

The Restrictive Covenant further provides, in relevant part, as follows:

> After termination of Representative's engagement with [Devos], Representative shall not (either directly, indirectly, or through others): (i) solicit or attempt to solicit the business of any of the customers of [Devos] or the business of any of the prospective customers of [Devos] with whom the representative dealt or had any contact on behalf of [Devos]; or (ii) encourage or induce any representative or employee of [Devos] to terminate his, her or its engagement or employment with [Devos].

For purposes of this opinion, the Court will refer to this provision of the Restrictive Covenant as the "Non-Solicitation Provision."

By the express terms of the Restrictive Covenant the parties further agreed that a breach by the individual Defendants would result in irreparable injury to Devos; that it will be impossible to ascertain the monetary amount of damages caused by the breach; and that Devos would have no adequate remedy at law.

Further, the Restrictive Covenant provides that the individual Defendants would not be impaired by its terms in their ability to earn a living during any of the relevant time periods.

The Court notes that the individual Defendants Ouchi, Granados, Record, and Olson executed the Restrictive Covenants on November 27, 2006; May 17, 2007; April 27, 2009; and August 3, 2010, respectively. Copies are in the record, collectively, as Exhibit "B" to the Volkes Declaration.

**C.    The Individual Defendants' Employment with Devos**

The individual Defendants Record and Granados submitted affidavits in opposition to the Plaintiff's motion, which state that they were employed by Devos as independent contractors, each holding the position of sales representative.  <u>See</u> Dec. 18, 2015 Declaration of Jacob Record ("Record Decl.") ¶ 2; Dec. 18, 2015 Declaration of Michael Granados ("Granados Decl.") ¶ 2.  These Defendants stated that their responsibilities included contacting potential clients and selling them Devos' reverse distribution services.  <u>See</u> Record Decl. ¶ 3; Granados Decl. ¶ 3. Potential clients were identified by reviewing industry directories.  <u>See</u> <u>id.</u>  In the event a client was obtained, the Defendants were responsible for servicing the account and personally traveling to the client's place of business to pick up their pharmaceutical returns.  <u>See</u> <u>id.</u>  Both men received a base salary of $40,000 per year, plus commissions.  <u>See</u> Record Decl. ¶ 4; Granados Decl. ¶ 4.

Volkes also described the individual Defendants' job duties, which he stated included overseeing sales management and sales operations; developing sales strategies; negotiating and assisting with sales efforts; and establishing and maintaining client relationships.  <u>See</u> Volkes Decl. ¶ 23.

**D.    The Allegations Relating to Confidential Customer Information**

Volkes stated that the individual Defendants had "virtually unlimited access to the Company's confidential information."  <u>Id.</u> ¶ 31.  In particular, Volkes asserts that the Defendants had access to "notes, memoranda, accounts, books, records, price lists, plans, referral resources, names of customers and prospective customers,

customer requirements, contracts, computer programs, databases, and other information compiled and organized by Devos over a considerable period of time and at a great expense and effort." Id. ¶ 20; see also id. ¶ 37 (stating that the individual Defendants "had access to the Company's customer lists, prospective lists and pipelines, sales strategy, pricing and margin information, and other financial data," as well as its "overall executive strategy").

In this regard, Volkes stated that Devos "prizes, above all, the development of its customer relationships" and stated that it possesses "special, unique and extraordinary relationships." Volkes Decl. ¶¶ 10, 16. Further, Volkes stated that Devos "does not advertise the identity of its customers and chooses to remain discreet about pricing instead of advertising such items on [its] website." Id. ¶ 19. Although the Plaintiff does not specifically identify any trade secrets, or other proprietary elements of its customer relationships, Volkes stated that the individual Defendants "were privy to all of the Company's information about its customers, including their identities, product selection and account management." Id.

The affidavits of Record and Granados dispute Volkes' statements. Both men stated that they are not now, and never were, privy to any highly sensitive confidential information about Devos or its customers. See Record Decl. ¶ 5; Granados Decl. ¶ 5. Contrary to the Plaintiff's assertions, the individual Defendants stated that "almost every aspect of the reverse distributor industry, including customer lists, prospective customers, pricing, and marketing strategies is commonly known amongst all members of the industry and commonly available in

various publications and websites available to the public."  Record Decl. ¶ 5; see Granados Decl. ¶ 5.

Further, the individual Defendants assert that the role of reverse pharmaceutical distributors is not unique and does not involve the utilization of propriety information.  Rather, reverse distributors simply "do a job that healthcare providers and other distributors of pharmaceuticals find too time consuming – to manage their return inventory."   Record Decl. ¶ 7;  see  Granados Decl. ¶ 7. According to the Defendants, it is the manufacturer, and not the reverse distributor, who determines which products are eligible for refund and the amount of such refund.  Further, these guidelines are published; are available in commercially sold computer software; and are generally known within the pharmaceutical returns industry.  See Record Decl. ¶ 6; Granados Decl. ¶ 6.

### E.    The Indictment and its Effects

In or about October 2014, a Grand Jury meeting in the Eastern District of Pennsylvania returned a 42-count indictment (the "Indictment"), charging Devos, Volkes, and two other individual Devos executives with mail fraud, wire fraud, and other related crimes.  See Volkes Decl. ¶ 11; Record Decl. ¶ 9; Granados Decl. ¶ 9. The Court notes that a copy of the Indictment is annexed to the declarations of the Defendants Record and Granados.

There is no dispute that, notwithstanding the Indictment, Devos remained at all times a going concern.  However, it is also undisputed that, in the immediate aftermath of the Indictment, the individual Defendants separated from Devos.

In this regard, Volkes stated that, shortly after he and Devos came under indictment, "it became necessary to terminate Defendant Record [because he] was performing poorly and was guilty of insubordination and disparaging Plaintiff." Volkes Decl. ¶ 12.  In particular, Volkes stated that Record had propositioned other employees and independent contractors of Devos to join him in a class action lawsuit against the company, which demoralized the Devos workforce and caused Record to "become widely perceived as disloyal and untrustworthy." Id.  The Court notes that Volkes does not specify the basis of this purported class action lawsuit.

Record concedes that he was terminated from Devos in March 2015.  See Record Decl. ¶ 12.  However, he attributes his termination to the alleged financial collapse of Devos in the wake of the Indictment.  In this regard, Record states that "[a]s word of mouth of the indictment spread throughout the industry, [he] lost approximately 90 percent of [his] clientele," which, due to his largely commission-based income, "caused [him] extreme financial hardship." Record Decl. ¶ 11.  Record further states that in or about late 2014 and early 2015, several other Devos employees and independent contractors were also terminated.  See id. ¶ 12.

As to the other individual Defendants, Volkes stated that they each submitted a resignation to the company at various times between March and July 2015.  See Volkes Decl. ¶ 39.  Similar to Record, the Defendant Granados stated in his opposing affidavit that he also lost approximately 90 percent of his clientele when word of the Indictment spread.  See Granados Decl. ¶ 11.  Further, he also stated that he suffered extreme financial hardship and that many of his colleagues

were terminated by Devos.  See id. ¶ 12.  According to Granados, "[t]he working conditions were so difficult and unpleasant that [he] believed [he] had no choice but to leave" the company.  Id.

The Court notes that, on December 21, 2015, the Plaintiff, through counsel, submitted a letter reply in support of the instant motion.  See Docket Entry ("DE") [10].   In the letter, Douglas E. Rowe, Esq. disputes the accuracy of the individual Defendants' assertions that they lost 90% of their income as a result of the indictment.  See id. at 3.  In this regard, attorney Rowe outlines measures that Devos allegedly took to compensate employees and subcontractors "for the potential market backlash associated with" the Indictment.  See id. at 3-4.  However, the Court notes that there is no evidence in the record other than counsel's statements to support these contentions.

Of importance, the Defendants assert that, as a direct consequence of the Indictment, Devos was placed on a so-called federal exclusion list.  See Record Decl. ¶ 10; Granados Decl. ¶ 10.  According to the Defendants, "this means that no federal agency can do business with Devos and that any pharmaceutical distributor who receives federal funding, including Medicare and Medicaid (which includes almost every distributor of pharmaceuticals), also cannot do business with Devos." Id.  In his reply letter, counsel for the Plaintiff disputed the Defendants' portrayal of the consequences of being on the federal exclusion list, but did not provide evidence to bolster his position.  See DE [10] at 5.

The Court notes that the United States Government operates a public database known as the System for Award Management ("SAM"), which provides information relating to government contractors.  The SAM website indicates that Devos, pending its criminal proceeding, is, in fact, ineligible to conduct a variety of business with government agencies.  See Exclusion Summary, System for Award Management, available at, www.sam.gov (last visited Dec. 23, 2015).  In particular, the following provisions appear on the SAM website and relate to Devos' current exclusion:

> Preliminary ineligible based upon adequate evidence of conduct indicating a lack of business honesty or integrity, or a lack of business integrity, or regulation, statute, executive order or other legal authority, pending completion of an investigation and/or legal proceedings; or based upon initiation of proceedings to determine final ineligibility based upon regulation, statute, executive order or other legal authority or a lack of business integrity or a preponderance of the evidence of any other cause of a serious and compelling nature that it affects responsibility.
>
> *     *     *
>
> Agencies shall not solicit offers from, award contracts to renew, place new orders with, or otherwise extend the duration of current contracts, or   consent to subcontracts in excess of $30,000 (other than commercially available off-the-shelf items (COTS)), with these contractors unless the agency head (or designee) determines in writing there is a compelling reason to do so.
>
> *     *     *
>
> No agency in the Executive Branch shall enter into, renew, or extend primary or lower tier covered transactions to a participant or principal determined preliminarily ineligible unless the head of the awarding agency grants a compelling reasons exception in writing.  Additionally, agencies shall not make awards under certain discretionary Federal assistance, loans, benefits (or contracts there under); nor shall an ineligible person participate as a principal, including but not limited

to, agent, consultant, or other person in a position to handle, influence or control Federal funds, or occupying a technical or professional position capable of substantially influencing the development or outcome of a funded activity; nor  act as an agent or representative of other participants in Federal assistance, loans and benefits programs.

Id.

For purposes of this opinion, the Court will take judicial notice of the SAM website and its contents.

## F.    The Facts Relating to the Corporate Defendant Outdate RX

Volkes stated, upon information and belief, that the individual Defendants devised a plan while still employed by Devos to misappropriate the company's business and otherwise cause economic harm to Devos.   See Volkes Decl. ¶ 15. Volkes contends that this scheme is presently being carried out by the individual Defendants' business activities under the ORX trade name.  See id.

The Defendants Record and Granados contend otherwise.  In his opposing affidavit, Record states that, after the Indictment and his termination from Devos, he was unable to secure other comparable employment because of his prior association with a company that was under indictment for fraud.   See Record Decl. ¶ 12.  Granados states that, because of the Restrictive Covenant, he also could not secure other employment because prospective employers feared a lawsuit by Devos.  See Granados Decl. ¶ 12.  Under these circumstances, Record and Granados stated that they decided to form their own reverse distribution company, namely, the corporate Defendant ORX.

It is undisputed that ORX is a California company, and that Record and Granados presently reside there.  Further, the complaint alleges that the individual Defendants Olson and Ouchi presently reside in Arizona and Hawaii, respectively. See Compl. ¶¶ 3, 5.  However, the record is unclear as to whether, during their tenure with Devos, the individual Defendants operated from California, New York, or elsewhere.

Volkes states that ORX is a direct competitor of Devos and is engaging in "the highly competitive business of pharmaceutical reverse distribution which includes the management of the disposal of unwanted or outdated drugs, discontinued medicines, and recalled, damaged, and expired pharmaceuticals."  Volks Decl. ¶ 41. In this regard, the Plaintiff submitted copies of internal e-mail correspondence between one Fredy Kadva, the Vice President of Outside Sales for Devos, and Volkes.  See Dec. 2, 2015 Affirmation of Anthony W. Cummings, Esq. ("Cummings Affm."), at Ex. "E" and "F."

In these e-mails, Kadva relays anecdotal evidence that a representative of ORX had solicited business from one of Devos's customers in California under false and fraudulent pretenses.  In particular, the e-mails suggest that this ORX representative, one Shane Sowers, had held himself out as being associated with Devos in order to obtain business from the customer.  This conduct forms the basis of the Plaintiff's tort claims, which are discussed more fully below.

The Defendants do not dispute that ORX is engaged in the business of reverse pharmaceutical distribution, but state that, while performing these services

under the ORX trade name, they have never represented to anyone that they are associated with Devos.  See Record Decl. ¶ 13; Granados Decl. ¶ 15.  In fact, at oral argument, counsel for the Defendants suggested that it would be ill-advised for the Defendants to associate themselves with a company under indictment for fraud.

Nevertheless, the Plaintiff contends that the Defendants are currently using, or will imminently use, their knowledge of Devos's confidential customer information and valuable customer relationships to misappropriate Devos's business.  For example, Volkes states that the Defendants are likely to use their knowledge of Devos's existing contracts and bidding procedures to outbid Devos for reverse pharmaceutical distribution business opportunities.  See Volkes Decl. ¶¶ 42-43.

## G.    The Instant Action

On December 4, 2015, Devos commenced the instant action, alleging a variety of tort and contract claims based on alleged misappropriation, unfair competition, conspiracy, tortious interference with economic advantage, breach of contract, and diversion of corporate opportunities, among others.

On December 17, 2015, Devos filed the instant motion by order to show cause, pursuant to Fed. R. Civ. P. 65, seeking preliminary injunctive relief and a temporary restraining order, as follows:

(1) Enjoining the individual Defendants from using, disclosing or disseminating any of Devos' confidential information or trade secrets;

(2) Enjoining the individual Defendants from working with or for ORX or any other competitor of Devos until after March 20, 2018;

(3) Enjoining the individual Defendants from engaging in, assisting, or having any active interest or involvement in any business or entity that is engaged in the same business as Devos;

(4) Enjoining the individual Defendants from soliciting, contacting, doing business with, calling upon or communicating with any customer, former customer or prospective customer of Devos;

(5) Enjoining the corporate Defendant ORX from employing or accepting services from the individual Defendants until March 20, 2018; and

(6) Enjoining the individual Defendants and the corporate Defendant from using any confidential information or trade secrets of Devos.

See Proposed OTSC, DE [4].

As noted above, in support of its motion, the Plaintiff submitted the affidavit of Darren Volkes, together with accompanying exhibits and a supporting legal memorandum.

On Friday, December 18, 2015, counsel for the parties appeared before the Court and placed initial arguments on the record. The same day, the following temporary restraining order was put into effect, pending the outcome of further proceedings:

[T]he Defendants are temporarily restrained and enjoined from communicating, contacting, and/or soliciting any customers of the Plaintiff Devos, Ltd. a/d/b/a Guaranteed Returns, in violation of the Agreements forming the subject matter of this action . . .

See TRO, DE [11].

On December 18, 2015, the Defendants submitted opposition to the Plaintiff's motion. As noted above, this included the affidavits of the individual Defendants Record and Granados, and an opposing legal memorandum.

On December 21, 2015, the Plaintiff submitted the letter reply by attorney Rowe, discussed above, in further support of its motion. Also on December 21, 2015, the parties again appeared before the Court and placed additional arguments on the record. At the conclusion of the hearing, the Court continued in effect the temporary restraining order, quoted above, and reserved decision on the Plaintiff's motion for injunctive relief.

Shortly before the close of business on December 22, 2015, the Plaintiff submitted a surreply. To the extent that the Plaintiff neither sought nor received leave of the Court to file this additional submission, the Court did not consider it in reaching this opinion.

For the reasons that follow, the Plaintiff's motion is now granted.

## II. Discussion

### A. The Applicable Standard of Review

"A plaintiff seeking a preliminary injunction or temporary restraining order must demonstrate '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.'" Fequiere v. Tribeca Lending, 14-cv-812, 2014 U.S. Dist. LEXIS 183152, at *8 (E.D.N.Y. July 15, 2014) (Report and Recommendation), adopted, 2015 U.S. Dist. LEXIS 35409 (E.D.N.Y. Mar. 20, 2015) (quoting Christian Louboutin S.A. v. Yves Saint Laurent America Holding, Inc., 696 F.3d 206, 215 (2d Cir. 2012)).

" 'It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)); see Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) ("An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief"); Iannucci v. The Segal Co., 06-cv-4720, 2006 U.S. Dist. LEXIS 43339, at *18-*19 (S.D.N.Y. June 26, 2006) ("[G]iven New York's strong public policy against restricting one's ability to make a living in the profession of his or her choice restrictive covenants are generally disfavored").

## B.   As to the Risk of Irreparable Harm Absent Injunctive Relief

In this case, the Plaintiff advances three related arguments in support of its contention that irreparable harm will result in the absence of an injunction: (1) the Restrictive Covenant stipulates that a breach by the Defendants will cause irreparable injury to Devos; (2) the individual Defendants possess confidential customer data and other propriety information that can be used to irreparably damage Devos' existing and prospective customer relationships; and (3) the unlawful solicitation of the Plaintiff's former employees by a competitor, namely,

16

the corporate Defendant ORX, will deprive Devos of its investment in the Defendants' training and development, as well as the existing and prospective customer relationships that Devos established through the individual Defendants. For the reasons that follow, the Court finds that the Plaintiff has sustained its burden of establishing irreparable harm in the absence of injunctive relief.

### 1.    The Governing Legal Principles

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' "  Singas Famous Pizza Brands Corp. v. New York Adver. LLC, 468 F. App'x 43, 45 (2d Cir. 2012) (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)).

"To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Bisnews AFE (Thail.) Ltd. v. Aspen Research Group Ltd., 437 F. App'x 57, 58 (2d Cir. 2011) (citing Faiveley, 559 F.3d at 118); see Singas, 468 F. App'x at 45 (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)); EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) ("If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied") (citing Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2dCir. 1991)).

Where, as here, the agreed-to language of a restrictive covenant explicitly provides that a breach by the employee will constitute irreparable harm to the

employer, other courts have found that fact sufficient to discharge the movant's burden of showing irreparable harm for purposes of a preliminary injunction.  See Ticor Title Ins. Co., 173 F.3d at 69 (where the employment contract sought to be enforced conceded that a breach would cause irreparable injury, the Second Circuit found that it "might arguably be viewed as an admission by [the employee] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision"); see Nat'l Elevator Cab & Door Corp. v. H & B, Inc., 282 F. App'x 885, 887 (2d Cir. 2008) (affirming preliminary injunctive relief where the parties' underlying agreement stated that money damages would be insufficient to remedy a breach thereof would constitute irreparable injury); North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm sufficient to warrant a preliminary injunction where the underlying employment agreement acknowledged that the employee's breach would cause irreparable harm to the employer); see also Iannucci v. The Segal Co., 06-cv-4720, 2006 U.S. Dist. LEXIS 43339, at *11-*12 (S.D.N.Y. June 26, 2006) ("A movant's demonstration of irreparable harm is strengthened significantly where the employee has previously acknowledged – most often in an employment agreement – that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur").

However, "a preliminary injunction will not lie if the movant can be adequately compensated by money damages."  Nat'l Elevator Cab & Door Corp. v. H & B, Inc., 07-cv-1562, 2008 U.S. Dist. LEXIS 5389, at *15 (E.D.N.Y. Jan. 28,

2009) (collecting relevant Second Circuit authority), aff'd, 282 F. App'x 885 (2d Cir. 2008).

In this regard, it has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction. For example, surveying relevant case law, a district court in the Southern District of New York appropriately stated that:

> Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm. As the Second Circuit recently explained, it is "very difficult to calculate money damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir. 2009); see also Shred-It USA, Inc. v. Mobile Data Shred, Inc., 202 F. Supp. 2d 228, 233 (S.D.N.Y. 2002); Unisource Worldwide, Inc. v. Valenti, 196 F. Supp. 2d 269, 280 (S.D.N.Y. 2002); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001); Garber Bros., Inc. v. Evlek, 122 F. Supp. 2d 375, 384 n.6 (E.D.N.Y. 2000); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999); Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility or irreparable harm, which increases as long as it continues unrestrained. What is at stake here is plaintiff's good will built up over the years, which is not, contrary to the defendant's assertion, monetarily ascertainable.").

Johnson Controls, Inc. v. A.P.T. Critical Sys., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); see also Global Switching Inc. v. Kasper, 06-cv-412, 2006 U.S. Dist. LEXIS 44450, at *35 (E.D.N.Y. June 29, 2006) ("In cases such as this, involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade

secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury") (quoting Innoviant Pharmacy, Inc. v. Morganstern, 390 F. Supp. 2d 179, 188-89 (N.D.N.Y. 2005)).

However, although it is true that a presumption of irreparable harm often arises in cases where a "trade secret" has been misappropriated, courts have cautioned against the unprincipled expansion of that term to grant protection to otherwise unprotectable categories of business information.   In particular, the district court in the Johnson Controls case appropriately stated the following:

> Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences.  FMC Corp. v. Taiwan Giant Industrial Co., 730 F.2d 61, 63 (2d Cir. 1984) ("It is clear that the loss of trade secrets cannot be measured in money damages."); Unisource, 196 F. Supp. 2d at 280; Webcraft Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1044-48 (S.D.N.Y. 1987). . . . Nevertheless, "an employee's 'knowledge of the intricacies of [a former employer's] business operation' is not a protectable interest sufficient to justify enjoining the employee 'from utilizing his knowledge and talents' " Production Resource Group [v. Oberman, 03-cv-5366, 2003 U.S. Dist. LEXIS 27898, at *40 (S.D.N.Y. Aug. 29, 2003)] (alterations in original, quoting Reed, Roberts Associates, Inc. v. Strauman, 40 N.Y.2d 303, 309, 353 N.E.2d 590, 594, 386 N.Y.S.2d 677, 670 (1976)).  Nor does simply labeling information as "confidential" render it protectable so that its loss results in irreparable harm.  See, e.g., AM Medica Communs. Group v. Kilgallen, 261 F. Supp. 2d 258, 2662 (S.D.N.Y. 2003) (finding that former employee's access to confidential client information did not inexorably lead to a finding of irreparable harm to her former employer).

Johnson Controls, Inc., 323 F. Supp. 2d at 532-33.

Also relevant here, "[j]ust as the violation of a non-compete in the solicitation of customers constitutes irreparable harm, the violation of a non-compete by the

20

solicitation of employees also constitutes irreparable harm." <u>Global Switching Inc.</u>, 2006 U.S. Dist. LEXIS 44450, at *37 (finding irreparable harm where the plaintiff's former employees were solicited to work for a competitor and "brought with [them] confidential customer information . . . as well as [their] personal inside knowledge of [the plaintiff's] customers and billing information") (citing <u>Natsource LLC</u>, 151 F. Supp. 2d at 469).

As noted above, the burden lies with the Plaintiff to clearly prove that it will suffer irreparable harm in the absence of a preliminary injunction.

**2.    Application to the Facts of this Case**

In this case, the Defendants do not dispute that they are competing with Devos.  Nor do the Defendants dispute that they are soliciting business from customers of Devos.  In fact, there appears to be a general agreement among the parties that, if the Restrictive Covenant is enforceable under New York law – a question discussed in greater detail below – then the Defendants are presently acting in violation of it.  Thus, on the current record, the Court finds that the Plaintiff has sustained its burden of showing that it will suffer irreparable harm if preliminary injunctive relief does not issue.

First, the Restrictive Covenant states in no uncertain terms that a breach by the individual Defendants would result in irreparable injury to the Plaintiff; that the Plaintiff's resultant damages would be unascertainable in monetary terms; and that the Plaintiff would have no adequate remedy at law.  As noted above, in cases involving alleged breaches of restrictive covenants, other courts have found such

explicit agreements regarding the nature of potential damages to be sufficient to discharge the movant's burden at this step of the analysis.

Second, although the individual Defendants dispute whether they actually possess confidential information about the Plaintiff, the record is sufficient to support a finding in the Plaintiff's favor.  In particular, Volkes' sworn statements suggest that the reverse pharmaceutical distribution industry is "highly competitive."   He asserted that Devos prides itself on developing client relationships, and considers those relationships to be its most valuable asset.  The parties do not dispute that the individual Defendants had meaningful access to important customer information and performed an integral aspect of the company's client-development strategy.   In fact, the Defendants concede that their responsibilities as sales representatives included identifying and contacting prospective customers; servicing customers' accounts; and personally retrieving customers' pharmaceutical returns – this active cultivation of client relationships was the entire premise of their commission-based compensation system.  To that end, there is evidence that the Defendants had "virtually unlimited access" to material such as customer lists, prospective customer lists, referral sources, customer preferences, sales strategies, pricing and margin information, and other financial data that Devos chose not to make publicly available.

Further, the e-mail correspondence annexed to the Plaintiff's motion demonstrates that, in at least one instance, a representative of the corporate

Defendant ORX, using methods similar to those utilized by Devos, performed competitive reverse distribution services for an existing customer of Devos.

In the Court's view, in light of the "somewhat relaxed approach" that courts in this Circuit have taken to the irreparable harm inquiry; and given the widely accepted principle that a violation of a restrictive covenant will generally result in injury that is incapable of ascertainment monetarily; the current record is sufficient to sustain the Plaintiff's burden. In this regard, applying the standards outlined above, the Court is of the view that the Defendants' admittedly competitive conduct is likely to cause imminent harm to the Plaintiff's customer relationships in a manner that will elude a straightforward dollars-and-cents calculation.

Lastly, the Court also finds that the Plaintiff will suffer irreparable harm if the corporate Defendant ORX is not enjoined from soliciting the services of the individual Defendants. As noted above, other courts have recognized that such conduct by a competitor constitutes irreparable harm, particularly where, as here, the employees bring with them confidential customer information and inside knowledge of the movant's customers and billing information.

Based on the foregoing, the Court finds that the Plaintiff has established the threshold showing required for a preliminary injunction to issue. Accordingly, the Court turns its attention to the second element, namely, whether the Plaintiff has demonstrated either: (1) a likelihood of success on the merits of its underlying claims; or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation.

**C.     As to the Plaintiff's Likelihood of Success on the Merits**

Initially, the Court notes that the Plaintiff brings two broad categories of claims against the Defendants, each of which should receive individualized attention at this stage of the analysis, namely:  (1) contract claims arising from the Defendants' alleged violation of the Restrictive Covenant (the "Contract Claims"); and (ii) tort claims arising from the Defendants' alleged unfair competition and diversion of corporate opportunities (the "Tort Claims").

The Court will begin with an analysis of the Contract Claims.

**1.     The Contract Claims**

It is well-settled that, in order "[t]o state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Cacchillo v. Insmed, Inc., 551 F. App'x 592, 593-94 (2d Cir. 2014) (quoting Harsco Corp. v. Sequi. 91 F.3d 337, 348 (2d Cir. 1996)); see Hudson & Broad. INc. v. J.C. Penney Corp., 553 F. App'x 37, 38 (2d Cir. 2014) (same).  Thus, in order to sustain its burden at this step of the analysis, the Plaintiff is required to establish that it is likely to succeed in establishing these elements, or that there exists sufficiently serious questions to make the Contract Claims a fair ground for litigation.

In this regard, the gravamen of the Plaintiff's breach of contract claim is that the individual Defendants, by and through the corporate Defendant ORX, are acting in violation of the non-competition and non-solicitation provisions of the Restrictive

Covenant.  In particular, the Plaintiff contends that the Restrictive Covenant is a valid and enforceable contract, which plainly prohibits the individual Defendants from working in the reverse pharmaceutical distribution industry at all, let alone from soliciting current and prospective clients of Devos.

For the reasons that follow, the Court finds that the Plaintiff has demonstrated sufficiently serious questions going to the merits of its Contact Claims to make them a fair ground for further litigation, and thereby discharge its burden of proof at this stage.

### a.   The First Breach of Contract Element – The Existence of an Enforceable Contract

The linchpin of this part of the analysis is the enforceability of the Restrictive Covenant.  See Nat'l Elevator, 2008 U.S. Dist. LEXIS 5389, at *35 ("In order to demonstrate a likelihood of success on the merits on its non-compete and non-solicitation claims, plaintiff must show that the restrictive covenants contained in the Agreement are enforceable"), aff'd, 282 F. App'x 885 (2d Cir. 2008); see Defs. Memo of Law at 9-10 (conceding that the viability of the Contract Claims depends on the enforceability of the restrictive covenant).  In this regard, the Plaintiff's entitlement to enjoin the Defendants' business conduct extends only so far as the permissible scope of the restriction.

### i.   The Governing Legal Principles

Under New York law, the enforceability of a restrictive covenant is determined according to a reasonableness standard, for which courts in this Circuit have adopted a two-part test:

> [1] The issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area.  See Reed, Roberts Associates, Inc. v. Strauman, 40 N.Y.2d 303, 309, 353 N.E.2d 590, 594, 386 N.Y.S.2d 677, 670 (1976). . . . [2] Assuming a covenant by an employee not to compete surmounts its first hurdle, that is, that it is reasonable in time and geographic scope, enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding an employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique.  See Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 272-73, 196 N.E.2d 245, 246 N.Y.S.2d 600 (1963) (Fuld, J.).

Ticor Title Ins. Co., 173 F.3d at 69); see also Johnson Controls, Inc., 323 F. Supp. 2d at 534 ("Even if a covenant not to compete is reasonable in time and geographic scope, however, enforcement will only be granted to the extent necessary to protect the employer's legitimate interests").

This is a fact-specific inquiry, which requires courts to assess whether the restriction "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public."  BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 712 N.E.2d 1220, 1223-24, 690 N.Y.S.2d 854 (N.Y. 1999) (emphasis in original).

Courts to have considered this issue under New York law have recognized that employers generally possess a legitimate business interest in protecting client relationships which were developed by a former employee at the employer's expense.  See id. at 1225 (holding that the employer's "legitimate interest [was] protection against defendant's competitive use of client relationships which [the employer] enabled him to acquire through his performance of accounting services

26

for the firm's clientele during the course of his employment"); see also IDG USA, LLC v. Schupp, 416 F. App'x 86, 87-88 (2d Cir. 2011) ("Under New York law, an employer has a legitimate interest in both its relationships with its customers and its trade secrets"); Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina, 9 A.D.3d 805, 780 N.Y.S.2d 675, 677 (3d Dep't 2004) ("[A]n anticompetitive covenant may prevent the competitive use of client relationships that the employer assisted the employee in developing through the employee's performance of services in the course of employment").  However, the New York Court of Appeals has also suggested that this interest may extend to clients with whom the former employee had not had a relationship during employment, but whom he solicited using confidential information belonging to the employer.  See id. at 1225 n.2.

## ii.    Application to the Facts of this Case

In the Court's view, although the current evidentiary record is relatively undeveloped, the Plaintiff has discharged its burden of showing that sufficiently serious questions going to the merits exist to make the Contract Claims a fair ground for litigation.

In this regard, the Court finds the district court's reasoning in the case of Iannucci v. The Segal Company, 2006 U.S. Dist. LEXIS 43339, to be persuasive. Similar to the facts of this case, in the Iannucci case, the plaintiff signed a restrictive covenant that prohibited him, for a period of three years after his employment with the defendant ("Segal"), "from rendering the types of services performed by Segal or its affiliates to any client of Segal for whom Segal or its

affiliates performed, or offered to perform, work at any time during the twelve months preceding plaintiff's termination."  Id. at *4.  In evaluating the temporal and geographical reasonableness of this restriction, the court reasoned as follows:

> [T]he Court finds that the geographical and temporal scope of the restrictive covenant, on the present record, is adequately reasonable. First, restrictive covenants lasting for three years or longer after an employee's termination have been enforced by New York courts.  See, e.g., Novendstern v. Mount Kisco Med. Group, 177 A.D.2d 623, 576 N.Y.S.2d 329, 330-31 (App. Div. 1991) (three years); Bates Chevrolet Corp. v. Haven Chevrolet, Inc., 13 A.D.2d 27, 213 N.Y.S.2d 577, 581 (App. Div. 1961) (five years).  Second, the New York Court of Appeals has refrained from invalidating entirely covenants with similar geographical reach by instead enforcing the covenants to a narrower universe of clients.  See BDO Seidman, 712 N.E.2d at 1225. . . . While the Court may find that a similar reformation is appropriate after reviewing a more developed evidentiary record, the Court finds that, on the present record, the subject covenant is adequately reasonable given the defendant's claim that plaintiff had "unfettered access" to *all* of defendant's confidential information, which would enable him to solicit any and all of Segal's clientele.

Iannucci, 2006 U.S. Dist. LEXIS 43339, at *20-*21.

Thus, because the pre-discovery record was not adequately developed, the court in the Iannucci case declined to make specific factual findings as to the reasonableness of the restrictive covenant's geographical scope.  However, accepting the employer's assertion that the former employee had enjoyed unfettered access to confidential information, the Court stated that, although it was not "in an appropriate posture to conclude that plaintiff ha[d] made a showing of its *likelihood* of success on the merits, it ha[d] 'sufficiently [shown] serious questions going to the merits to make them a fair ground for litigation.' "  Id. at *21 (emphasis in original) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.

1979)); cf. SD Prot., Inc. v. Del. Rio, 498 F. Supp. 2d 576, 585-86 (E.D.N.Y. 2007) (holding, in the context of a motion to dismiss, that without "specific facts" having been developed through discovery, it would be "premature" to determine whether a restrictive covenant was reasonable under the circumstances).

In the Court's view, a similar result is warranted here.  Initially, based on the applicable caselaw, the Court finds no issue with the three-year temporal scope of the Restrictive Covenant at issue in this case.  Further, although the Restrictive Covenant is virtually unbounded in geographical scope, covering the entire continental United States; and despite the relatively undeveloped state of the record; the Plaintiff's assertions at this juncture make it plausible that specific facts will be elicited during discovery to establish the reasonableness of this restriction.

In this regard, Volkes states that the corporate Plaintiff is headquartered in New York and maintains "satellite offices across the United States."  However, neither he nor the individual Defendants specify where in United States the Defendants actually worked during their tenure with Devos.  As noted above, the corporate Defendant ORX is a California company, and the individual Defendants Record and Granados reside there.  However, the individual Defendants Olson and Ouchi reside in Arizona and Hawaii, respectively.  Thus, it is reasonable to assume that the Plaintiff maintains a national presence, which would militate in favor of upholding an expansive geographical limitation on employees' ability to compete with the company after their termination.  See SD Prot., Inc. v. Del. Rio, 498 F. Supp. 2d 576, 585-86 (E.D.N.Y. 2007) ("[R]estrictive covenants of broad or

unlimited geographic scope have been upheld where such restrictions were reasonable in view of the specific facts of the case" (internal quotation marks and citation omitted)); Ivy Mar Co. v. C.R. Seasons, 907 F. Supp. 547, 558-59 (E.D.N.Y. 1995) (Report and Recommendation) (collecting relevant authorities upholding restrictive covenants of expansive and/or unlimited geographic breadth), adopted, 1995 U.S. Dist. LEXIS 20174 (E.D.N.Y. Oct. 2, 1995); Business Intelligence Servs., Inc. v. Hudson, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984) (noting that, although the unlimited geographic scope of the restrictive covenant was "troubling," it was not unreasonable in light of the fact that the employer's "business [wa]s worldwide"); see also Marsh USA Inc., 2008 U.S. Dist. LEXIS 90986, at *48 (noting that "New York state courts have upheld non-solicitation agreements imposing client-based restrictions without geographic limitation as reasonable in scope") (collecting cases).

However, as noted above, even if a Restrictive Covenant is reasonable in time and geographic scope, enforcement will only be granted to the extent necessary to protect the employer's legitimate interests.  See Ticor Title Ins. Co., 173 F.3d at 69; Johnson Controls, Inc., 323 F. Supp. 2d at 534.  Therefore, having found that the Restrictive Covenant satisfies the initial test of reasonableness, the Court now looks to whether the restrictions are necessary to prevent the Defendants' solicitation or disclosure of trade secrets; or to prevent their release of confidential information regarding the Plaintiff's customers.  See id.

As noted above, the Defendants do not deny that they are engaged in the reverse pharmaceutical distribution industry or that they are presently competing

with the Plaintiff.  In fact, counsel for the Defendants made clear at oral argument that the Defendants believe that they are within their rights to specifically compete for the business of customers whose relationship with the Plaintiff may be restricted by the federal exclusion list.  Further, as noted above, there is evidence that representatives of the individual Defendants' new employer, the corporate Defendant ORX, are actively soliciting business from customers of Devos, under allegedly false pretenses.  Under these circumstances, the Court concludes that, during the pendency of this litigation, the proposed restrictions are needed to protect the Plaintiff's legitimate interest in safeguarding its valuable customer relationships and confidential customer information.

As discussed above, on the present record, and in light of the national reach of the Plaintiff's business operations, at this time there is no principled basis for the Court to conclude that the proposed temporal and geographic limitations are any more restrictive than needed to protect the Plaintiff's business from the Defendants' largely undisputed conduct, in violation of the Restrictive Covenant.

Further, the Court does not find there to be a basis at this time for concluding that the Restrictive Covenant will unduly burden the Defendants or contravene an established New York public policy.  In this regard, the Court is sensitive to the individual Defendants' assertions that a preliminary injunction will effectively deprive them of the ability to earn a living in their chosen profession.  See Defs. Memo of Law at 17; Record Decl. ¶ 14; Granados Decl. ¶ 13.  However, the Court notes that the plain language of the Restrictive Covenants, which these Defendants

knowingly executed, states that "the provisions of this Covenant shall not prevent Representative from earning a living during any and all periods described in this Covenant." Volkes Decl., Ex. "B." Thus, for substantially the same reasons as discussed above, this agreed-upon language "might arguably be viewed as an admission by" the individual Defendants, which materially contradicts the position they now take for purposes of opposing this motion. See Ticor Title Ins. Co., 173 F.3d at 69; Nat'l Elevator Cab & Door Corp., 282 F. App'x at 887; North Atl. Instruments, Inc., 188 F.3d at 49; Iannucci, 2006 U.S. Dist. LEXIS 43339, at *11-*12.

Further, at this early stage in the litigation, the factual record does not support a finding that enforcement of the Restrictive Covenant will offend public policy, and the Defendants do not identify any such policy that they contend will be violated in any event. On the contrary, if, as the Plaintiff preliminarily contends, the Defendants abandoned the company when the Indictment became public, and, utilizing their knowledge of confidential customer information, embarked on a course of conduct designed to capitalize on the negative publicity by converting business opportunities for their own benefit, then, in the Court's view, "the general public policy favoring robust and uninhibited competition" has no applicability here. Am. Inst. of Chem. Eng'rs v. Reber-Friel Co., 682 F.2d 382 (2d Cir. 1982) (recognizing that "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with 'the general public

policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood' ").

Based on the foregoing, the Court finds there to be sufficiently serious questions going to the enforceability of the Restrictive Covenant to make that question fair ground for litigation.

### iii.    The Effect of the Indictment on the Enforceability of the Restrictive Covenant

The Court takes special note of an issue that figures prominently in this case, namely, what effect, if any, the Indictment and the Plaintiff's placement on a federal exclusion list have on the enforceability of the Restrictive Covenant.

In this regard, throughout their submissions to the Court, the Defendants assert various iterations of the same basic argument, namely, that the Indictment materially alters the parties' relationship, thereby excusing the Defendants' obligations under the Restrictive Covenants or precluding the Plaintiff from enforcing them.  Although the Court agrees that the Indictment and the federal exclusion list are relevant in this case, it disagrees that they provide a sufficient legal basis to abrogate the otherwise enforceable Restrictive Covenant.

Initially, as the Plaintiff points out, the Defendants do not cite any authority for the result that they seek, and the Court's independent research has not revealed any.  In particular, the Defendants cite no case law for the proposition that the indictment of one party to a contract excuses the performance of the other; or that a party forfeits valid private contract rights by coming under indictment; or that

negative market reaction to news of an indictment invalidates an otherwise enforceable restrictive covenant.

In the Court's view, such positions are untenable, as a matter of law.  In this regard, it is well-settled that an indictment is merely an accusatory instrument, and lacks probative value of any wrongdoing.  See United States v. Johnson Contr. of WNY, Inc., 11-cr-241, 2012 U.S. Dist. LEXIS 169086, at *17 (W.D.N.Y. Sept. 18, 2012) (Report, Recommendation and Order) ("It is axiomatic that an indictment is merely an allegation and proof of nothing.  The court routinely instructs the jury on this point") (quoting United States v. Bruno, 09-cr-29, 2009 U.S. Dist. LEXIS 74278, at *16 (N.D.N.Y. Aug. 21, 2009)), adopted, 2012 U.S. Dist. LEXIS 167709 (W.D.N.Y. Nov. 27, 2012); Stanford Trading Co. v. V.R.I. Distrib. Corp., 3:98-cv-0591-L, 2003 U.S. Dist. LEXIS 11993, at *9 (N.D. Tx. July 14, 2003) (declining to take judicial notice of an indictment as evidence of wrongdoing because "[a] criminal indictment is only an accusatory document and is proof of nothing") (citing United States v. Morrow, 177 F.3d 272, 292 (5th Cir. 1999), cert. denied sub nom., 528 U.S. 932, 120 S. Ct. 333, 145 L. Ed. 2d 260 (1999); People v. Romano, 74 Misc. 2d. 382, 384, 343 N.Y.S.2d 697 (Sup. Ct. Queens Cnty. 1973) (noting that "an indictment is an accusatory instrument and is without probative force and carries with it no implication or suspicion of guilt," nor is it "evidence or a substitute for evidence").

Therefore, the Court can discern no rational basis for adopting the Defendants' position.  On the contrary, it would run counter to established principles of criminal justice – namely, the fundamental presumption of innocence –

to strip an accused of his right to enforce a contract provision intended for his benefit *before* the relevant prosecuting authority was required to prove his guilt beyond a reasonable doubt. In the Court's view, this concern is uniquely applicable in the context of enforcing otherwise reasonable anticompetitive covenants, where allowing employees to capitalize on potentially unfounded accusations against their employer by ransacking its customer base would produce the very type of unsavory market behavior that restrictive covenants try to eliminate.

As noted above, this is not to say that the Indictment, or the placement of Devos on a federal exclusion list, are not relevant or material in this case. As a practical matter, the Plaintiff's reasonable expectations with regard to current and prospective customers may well be altered as a result of both. However, at this juncture, it is undisputed that Devos remains a going concern and denies the allegations of wrongdoing. Therefore, unless and until there is a final disposition in the criminal proceeding, this Court can see no reason to deny legal protection to the Plaintiff's interest in preserving its valuable and confidential customer information. Thus, in the Court's view, during the pendency of this litigation, the Indictment and the federal exclusion list do not present sufficient bases for excusing the Defendants' compliance with the Restrictive Covenants.

### b.    The Remaining Breach of Contract Elements

In addition to the existence of an enforceable agreement, the Plaintiff is also required to demonstrate either a likelihood of success on the remaining elements of a New York breach of contract claim, or sufficiently serious questions going to those

elements to make them fair ground for litigation.  For the reasons that follow, the Court finds that the Plaintiff has discharged its burden in this regard.

Initially, as discussed more fully above, the Defendants do not dispute that they are engaged in the conduct that forms the basis of the Plaintiff's breach of contract claim.  In this regard, the parties' dispute is one of law regarding the legal sufficiency of the contract, not one of fact regarding the Defendants' allegedly violative actions.  Accordingly, assuming the enforceability of the Restrictive Covenant, the Plaintiff is likely to establish the third element, namely, a breach of the covenant by the Defendants, and the fourth element, namely, damages flowing from the breach.

However, the Defendants dispute the second element, namely, whether the Plaintiff adequate performed its part of the bargained-for exchange.  In this regard, the Defendants rely principally upon the existence of the Indictment as grounds for contending that the Plaintiff materially breached the underlying subcontractor agreements.  In particular, the Defendants assert that Devos breached their end of the employment agreements: (1) by engaging in the criminal conduct outlined in the Indictment; and (2) by terminating and/or constructively discharging the individual Defendants.  As noted above, according to the Defendants, both of these circumstances either excuse their obligations under the Restrictive Covenants or preclude the Plaintiff from enforcing them.  The Court disagrees.

First, as described in greater depth above, the Court rejects the contention that, by virtue of the Indictment, the Plaintiff comes before it with "unclean hands"

and should be found to have breached the implied covenant of good faith and fair dealing in the subcontractor agreements.  For substantially the same reasons as outlined above, the Indictment is not proof of any wrongdoing, and the Plaintiff may not be held liable for any criminal conduct alleged by the government.

Second, it is true that a line of New York cases, most prominently Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 48 N.Y.2d 84, 89, 421 N.Y.S.2d 847, 849, 397 N.E.2d 358 (1979), holds that "an employee's otherwise enforceable restrictive covenant is unenforceable if the employee has been terminated involuntarily, unless the termination is for cause."  See, e.g., Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 89 (2d Cir. 2007) (i; Nisselson v. DeWitt Stern Group, Inc., 225 B.R. 51, 55 (S.D.N.Y. 1998); see also Grassi & Co., CPAs, P.C. v. Janover Rubinroit, LLC, 82 A.D.3d 700, 702, 918 N.Y.S.2d 503 (2d Dep't 2011); Michael I. Weintraub, M.D., P.C. v. Schwartz, 131 A.D.2d 663, 665-66 (2d Dep't 1987).  In this case, there is no dispute that the Defendant Record was terminated. However, there is evidence that he was terminated for poor performance, insubordination, and demoralizing the Plaintiff's workforce, namely, for just cause. In addition, there is no evidence at all relating to the circumstances under which the other individual Defendants resigned from Devos, other than the single conclusory statement by Granados that "[t]he working conditions were so difficult and unpleasant that [he] believed [he] had no choice but to leave" the company. Thus, on the record before it, the Court is unable to conclude that Post and its progeny are likely to apply to the facts of this case.

Accordingly, the Court is of the view that sufficiently serious questions going to the merits of the Plaintiff's Contract Claims exist to make them fair ground for litigation.  Therefore, as to the Contract Claims, the Court finds the second element of the preliminary injunction standard is satisfied.

### c.    As to Whether the Balance of Hardships Tips Decidedly Favor the Plaintiff

As discussed above, the Court finds that the current record does not necessarily support a finding of *likelihood* of success on the merits of each element of the Plaintiff's Contract Claims; rather, it is satisfied that a lesser, although equally permissible, showing has been made, namely, that sufficiently serious questions exist as to certain factual issues to make the Contract Claims a fair ground for litigation.  Consequently, the Court must now also determine whether the balance of hardships tips decidedly in the Plaintiff's favor.  See Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981) ("Unless the balance of hardships tips decidedly in favor of the movant, the court need not decide whether there are serious questions presenting a fair ground for litigation"); Dominic v. Delaloye, 12-cv-1551, 2012 U.S. Dist. LEXIS 54023, at *32-*34 (E.D.N.Y. Apr. 17, 2012) ("The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships

*tips decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard") (emphasis in original) (quoting <u>Citigroup Global Markets, Inc. v. VCG Special Opps. Master Fund Ltd.</u>, 598 F.3d 30, 32 (2d Cir. 2010)); <u>see also</u> <u>Minzer v. Keegan</u>, 97-cv-4077, 1997 U.S. Dist. LEXIS 16445, at *36 (E.D.N.Y. Sept. 22, 1997) ("Where, as here, likelihood of success cannot be shown, a party requesting a preliminary injunction may nonetheless prevail by showing serious questions going to the merits and a balance of hardships tipping decidedly in that party's favor").

In order to prove that the balance of hardships tips in its favor, the Plaintiff "must show that the harm which [it] would suffer from the denial of [its] motion is 'decidedly' greater than the harm [the Defendants] would suffer if the motion was granted." <u>Buffalo Forge Co.</u>, 638 F.2d at 568. Applying this standard, the Court finds the record sufficient to support a finding in the Plaintiff's favor.

The evidence suggests that, if the Defendants' admittedly competitive conduct is permitted to continue unabated, the Plaintiff runs the legitimate risk of losing numerous valuable customer relationships that it has expended substantial time and resources, through the individual Defendants and other such subcontractors, to develop. By contrast, the Defendants identify no discernible harm from the enforcement of the Restrictive Covenant other than their conclusory statements that an injunction will prevent them from earning a living – assertions which, as the Court noted above, are contradicted by the very language of the Restrictive Covenants that they signed.

In this regard, the Defendants assert that customers of the Plaintiff will terminate their business relationships and seek reverse distribution business services elsewhere as a result of the Indictment.  See Defs. Memo of Law at 19 (asserting that "the healthcare providers are not going to continue to do business with vendors who have allegedly cheated and stole from them").  However, in the Court's view, this type of speculation is precisely why a preliminary injunction enforcing the Restrictive Covenant is needed during the pendency of this case.  At the moment, there is no viable evidence that the Plaintiff engaged in wrongdoing.  However, by virtue of the Indictment, the Plaintiff is subject to the federal exclusion list.  In this regard, despite the fact that the Plaintiff remains a going concern and maintains its innocence in the criminal proceeding, the Defendants are engaging in a competitive business.  Further, allegedly, the Defendants are exploiting the Plaintiff's inclusion on the federal exclusion list to disparage the Plaintiff; cast the allegations in the Indictment as facts; and convert the Plaintiff's customer base to the Defendants' benefit.

Accordingly, the Court finds that the Plaintiff has sustained its burden under Rule 65 to warrant a preliminary injunction in its favor.

### 2.    The Tort Claims

The Court notes that, in addition to the Contract Claims, the Plaintiff also asserts Tort Claims arising from the Defendants' alleged unfair competition and diversion of corporate opportunities.  The factual underpinning of the Tort Claims is the Defendants' role as a competitive market participant for reverse pharmaceutical

distribution business, including and especially involving the current and prospective customers of the Plaintiff.   Ordinarily, these claims would be independently evaluated using the analytical framework discussed above. However, the Court has now found a sufficient basis for granting the preliminary injunctive relief sought as it relates to the Contract Claims, which includes an injunction on the Defendants' ability to compete with the Plaintiff in the reverse pharmaceutical distribution industry during the pendency of this litigation.  Thus, because the scope of the preliminary injunction warranted by the Contract Claims will necessarily extend to the conduct giving rise to the related Tort Claims, the Court finds it unnecessary to engage in a second, parallel analysis at this time.

## D.    As to an Undertaking as Required by Fed. R. Civ. P. 65(c)

Pursuant to  Fed. R. Civ. P. 65(c),  the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Given the extraordinary nature of the provisional remedy awarded to the Plaintiff; and given the very serious implications that the Court's ruling will have on the Defendants; in its discretion, the Court imposes a condition on the issuance of the injunction, namely, the posting of a bond in the amount $250,000.00 to cover the possible costs and damages that may be incurred by the Defendants if there is a determination that the injunction was improvidently granted.  See Inflight Newspapers v. Magazines In-Flight, L.L.C., 990 F. Supp. 119, 140 (E.D.N.Y. 1997) (imposing $250,000 bond in connection with

preliminary injunction enforcing restrictive covenant); see also Leibowitz v. Aternity, Inc., 10-cv-2289, 2010 U.S. Dist. LEXIS 70844, at *65-*67 (E.D.N.Y. July 14, 2010) (same); Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007) (same).

This undertaking shall be filed within twenty days of the date of this Order. If the bond is not timely filed, the Defendants are granted leave to return to the Court and make an application to vacate the preliminary injunction.

### III.   Conclusion

Based on the foregoing, the Plaintiff's motion for a preliminary injunction is granted as follows:

Pending a final disposition of the case in this Court, or an Order by this Court vacating the preliminary injunction, it is

**ORDERED,** that the individual Defendants are enjoined from using, disclosing or disseminating any of the Plaintiff's confidential information or trade secrets; and it is further

**ORDERED**, that the individual Defendants are enjoined from working with or for the corporate Defendant ORX, or any other competitor of Plaintiff; and it is further

**ORDERED**, that the individual Defendants are enjoined from engaging in, assisting, or having any active interest or involvement in any business or entity that is engaged in the same business as the Plaintiff, as that phrase is described in the underlying subcontractor agreements between the parties; and it is further

**ORDERED**, that the individual Defendants are enjoined from soliciting, contacting, doing business with, calling upon or communicating with any customer, former customer or prospective customer of the Plaintiff; and it is further

**ORDERED**, that the corporate Defendant ORX is enjoined from employing or accepting services from the individual Defendants; and it is further

**ORDERED**, that all of the Defendants Defendant are enjoined from using any confidential information or trade secrets of the Plaintiff.

These restrictions shall be effective immediately.  However, within twenty days of the date of this Order, the Plaintiff is required to post a bond in the amount $250,000.00 to cover any possible costs and damages of the Defendants.

It is **SO ORDERED.**

Dated:          Central Islip, New York
                December 24, 2015          */s/  Arthur  D.  Spatt*
                                           ARTHUR D. SPATT
                                           United States District Judge

43